Morning, your honors. May it please the court. My name is Matt Hayhurst and I am here today on behalf of BNSF Railway Company, the appellant in this case. At the outset, I'd like to thank the court for giving us the opportunity to provide oral argument today and to reserve two minutes, if I may. In preparing for argument today, I was really struck by the context and timing of events in this case. And what I mean by that is this. In 1983, the U.S. Supreme Court decided a seminal case involving the Federal Arbitration Act. That's the Moses H. Cohn hospital case. And in that opinion, Justice Brennan emphasized the liberal federal policy favoring arbitration, that arbitration agreements must be liberally construed, and that any doubts have to be resolved in favor of finding arbitration. Now, that was 1983. And at that same time and in that same year, Burlington Northern and the state of Montana were enmeshed in litigation. And when they settled that case in 1984, they envisioned and planned for a future business relationship between BNSF and the state's short line. And in the wake of that litigation that they were ending, and in the wake of the Cohn case, these sophisticated entities, experienced litigants on equal footing, decided at arm's length that future disputes between the short line and between BNSF would be resolved through arbitration. And that's why they attached this template of an agreement to be executed later to the settlement agreement. Well, can you point to any language in the settlement agreement that shows an intent to incorporate the entire interchange agreement? What it says in section 9.2, I believe, Your Honor, the settlement agreement, is that the state will find a short line railroad to operate this little section, and that they will enter into an agreement. The fact that we're having a longer answer tells me you can't expressly say that there's language that incorporates the entire interchange agreement. Well, there's an integration clause that says the settlement agreement and all of the appendices here, too, which includes Appendix B, which is our template, is part of the settlement agreement. But the important part is that... I have is that, where do I find the intent to incorporate the entire interchange agreement? In section 9.2, Your Honor, the state agrees that it will require its short line operator to enter into an agreement for interchange of railroad cars with BN in the form and in substance attached as Appendix B. The Appendix B provides, and the parties agree that, and then it sets forth terms. So Appendix B is attached to the agreement, and then, of course, there's an integration clause later in the settlement agreement that says that appendix is part of the agreement. Now... What about this agreement suggests either a broad or a narrow reading of the arbitration clause? Your Honor, it... For example, what do we want to make of the fact that the phrase or related to is not incorporated in this particular agreement? It contains a myriad of broad terms, Your Honor, and it doesn't contain related to, but it contains in connection with and other broad terms throughout. And, in fact, if you read through the cases cited by the parties in their briefing, there is not a single case with as broad of an arbitration provision where arbitration was not ordered. All right, but our court's precedent, when we're talking about, we've got, you know, the 11th, 7th, 4th, and 3rd, you know, have certain precedent. The 9th and the 2nd have a limit under or arising from. So, we're in the 9th Circuit, so our court's precedent in Tracer and Mediterranean limit the scope of the arbitration clause to only claims under the interchange agreement. How do you distinguish these cases? It's distinguished in the Simula versus AutoLib case, Your Honor. And, in fact, it's distinguished in the Mediterranean and Tracer cases themselves where they emphasize that the only language in those particular cases was the arising here under or arising out of. And they specifically indicate that the lack of relating to language is a significant omission. Both the Tracer case and the Mediterranean Enterprises case say, look, there's not this broader language. We only have arising here under or similar language in this arbitration clause. Nothing else. The arbitration clause in this case, by contrast, is much, much broader. And, in fact, if you read the arbitration provision as Central Montana would like to read it, then almost all of the language in it is surplusage. Because it talks not only about performance under the interchange agreement. It also talks about several other terms in there. Construction, conditions, rights, obligations, and, most importantly, the business and manner to transacting business under the agreement. If the parties had intended that the arbitration provision be limited to a breach of the interchange agreement, they could have drafted it that way. But that's not what they did. Instead, they used broader language right at the time when the U.S. Supreme Court was emphasizing that arising out of or relating to is enough to capture all these types of claims. Would you just briefly educate someone from Los Angeles who is not familiar with grain elevators and that sort of thing? Would you tell me what the construction of this grain elevator and the shuttle facilities and loop tracks have to do with the interchange of rail cars? This particular shuttle facility is located right where these two lines meet up. And it's literally a loop as described with a shuttle facility that allows for the loading of 110-car shuttle trains with the idea that a bigger train is more efficient than a smaller train and having to hook in just a few number of cars. What the interchange agreement addresses is broad, Your Honor. It talks about insurance. It talks about trackage rights. It talks about the payment of what BM has to pay to CMR for each car interchange. It covers every aspect of their relationship. And then it says in the arbitration provision that disputes involving the business or manner to transacting business are subject to arbitration. Now, you could argue that if this was just about interchange, maybe that is manner to transacting business under the interchange agreement. But what is the business under the interchange agreement? We know that these terms are construed broadly. And certainly the business of Central Montana Rail is shipping rail cars. That's what this entire dispute is about. It's about what they're viewing as unfair, predatory pricing with respect to their shipping industry, which is affecting them. That's what this case is about. And the arbitration provision that the parties entered into clearly states that those kinds of things are subject to arbitration. It's hard to imagine how it really could have been broader, Your Honor, how it could have captured these types of disputes. And we certainly know from Moses Cone case that they don't have to identify every legal theory. They don't have to dream up every possible circumstance that might occur in the future. Instead, if there's an intent to arbitrate and they use plain and simple language, it's supposed to cover and it will extend beyond the four corners of the interchange agreement and capture all types of disputes. Well, tell me, what exactly are we talking about when we're talking about the interchange of railroad cars? That would be, Your Honor, where railroad cars from Central Montana Rail are put off into an area and then they are picked up by the BN for transport down the line. It's all just part of, you know, it's a little bit like a regional airline being connected with a more major airline. And, you know, the big airline picks up the people from Los Angeles and brings them to Salt Lake City, for example, and then there's a small jet that takes them up to Missoula, Montana, where I'm from. And so it's simply the interchange of passengers in the airline example or the interchange of rail cars in our example, all of which I might mention is part of certainly interstate commerce, despite Central Montana Rail's argument to the contrary. You see, I've gone under a minute here. Well, we'll let you reserve that for rebuttal. All right. Thank you. Thank you. Good morning. For the record, Clifford Edwards from Billings, Montana, on behalf of Central Montana Rail, I would like to introduce my clients that we brought with us. Carla Allen, if she'd stand. She is our CEO, and she is also a certified railroad locomotive engineer. The chairman of the board is Larry Barber. They're both from Denton, Montana. Larry is not certified to run locomotives, but he's a pretty fair hand on tractors. Denton, Montana is a town of 250 people. Geraldine, Montana, about the same. However sparse our population is there, there are hundreds and thousands of acres of grain land that are serviced by this railroad. This is why, in 1983, when the Burlington Northern reneged on their agreement to keep that short line, that the state of Montana, through the governor, brought suit against the railroad. And the railroad, with its sophisticated lawyers, entered into an agreement with Montana that said, we will not predatorily price, we will do nothing to interfere with that short line. It is vital to the economy of a huge area of Central Montana, and it is vital to the state of Montana so that we don't have to have trucks all over these gravel roads and highways. Now, when the Burlington Northern began predatory pricing, began denying access to the loop through the 110-car facility, we went to the state of Montana, we went to the governor, and we asked that the governor would instruct his council to enforce this 1984 agreement. The governor said, no, Mr. Edwards, what we'll do is we will assign that agreement to you. The state doesn't want to get involved in the litigation. Central Montana is a full assony, a complete assony of the state, can bring their own action in their own regard and enforce Montana's agreement. That's what we did. In the Burlington Northern... Wait, wait, wait, okay. You had an agreement with respect to the interchange of our railroad cars, but the settlement agreement was with the state of Montana? Yes, solely with the state. CMR did not even exist when the state and BN settled. All right. Now, BNSF has made the argument that the two are actually related, and if so, then it would not have been necessary for the state of Montana to assign to you its rights. You're enforcing rights that arose under a separate settlement agreement with the state of Montana. Yes, we are. How then do we tie that settlement agreement together with the interchange agreement? Well, one came after the other, of course, but the interchange agreement is garden variety. It is in every relationship between a short line and a major railroad anywhere in the United States. All it does is govern the movement of cars onto each other's tracks. I think one of the key things that BN is absolutely missing here, and deliberately so, in the settlement agreement with Montana, there is a Section 9, and Section 9 in that agreement sets forth exactly what the interchange is going to be. And today's payment by BN to Central Montana Railroad is made pursuant to Section 9 of the Montana Settlement Agreement. I actually believe that the attachment that was put on as a blank form that was two years later actually filled out, I don't think it is even needed. I think Chapter 9, Paragraph 9 of the Maine-Montana Agreement covers it, and that is the agreement that there is absolutely no arbitration clause at all. And the proof is in the pudding. The Burlington Northern is paying us exactly what they said they would pay way back in 1984 under that Paragraph 9. There are inflation adjustments, and that's what's being paid today. I think that the interchange agreement has nothing to do with the principal claims that we brought in the litigation. The principal claim is they breached the agreement with the state that they reached in 1984 by predatory pricing, by denying us, and that has nothing to do with an interchange agreement. That breach is broad, and that breach is sole and independent. Now, we also have brought tortious interference with our business. That's got nothing to do with the interchange agreement. And the Burlington Northern, when we filed this case November 15th of 2005, we filed it in state court. They removed it. We fought the removal. Federal court kept the case. We had a preliminary pretrial with the magistrate judge in June of 2006. The Burlington Northern, Mr. Hayhurst, was present. We agreed to a discovery plan. We went forward with litigation. Much discovery was accomplished. We had a trial date set for June of 07. We disclosed experts, and we were going along until the fall of 06 when they brought this motion to compel arbitration. January 31st of 2007, Magistrate Judge Strong got it exactly right. His order is short, as the court knows. He signed it on the top of page nine. He was absolutely on the money with his findings that this interchange agreement does not have anything to do with this case and that we should be in court. And, of course, BN was able to then appeal to the Ninth Circuit, and we have been derailed, as it were, for another 16 months. We're asking this court, it's a simple issue, I believe, that our stand-alone agreement with the state, which contains the very essence of the interchange agreement by how much we pay for cars, that's the only interaction that we have with them, and it's spelled out in that agreement, and it's being paid pursuant to that agreement, and there is no arbitration clause anywhere to be found. Judge Strong got it exactly right. Does the strong federal policy favoring arbitration operate only when there is a broad arbitration clause, or what's your position on that? Well, my position on arbitration clauses is probably different than most, and practicing in Montana where they're not favored and narrowly construed, and then we find some comfort in the Mediterranean case and the Ninth Circuit that they have to be narrowly construed. I believe that if you're going to have a strong policy towards arbitration, then you have to have clear language in the contract about arbitration. There is none in the state of Montana agreement, which we have full assignment of, Your Honor, and there is no way that we can be compelled to arbitrate by an attachment that wasn't even in existence when that Montana agreement was entered into. All right. Do you have any further questions? No, thank you. We don't have any further questions. Thank you. Briefly, Your Honor, the interchange agreement requires the payment per car. It's in the settlement agreement, but it's also in the interchange agreement. Currently it's at ER 143, excerpt from record 143. That's paragraph 5 of the interchange agreement, which was subsequently amended a few times, but it's all still part of the interchange agreement. That's what requires BN to pay Central Montana Rail the $275 per car originally, which is now up significantly higher. That's what this case is about. Central Montana Rail thinks that they should have been shipping more grain and that they should have been paid more by BNSF. The requirement for paying Central Montana Rail is in the interchange agreement, ER 143, and there's an arbitration clause that covers anything, as far as I'm concerned, relating to the interchange agreement. It's certainly broadly worded, and to construe that as being narrow would be antithetical to the spirit of the Federal Arbitration Act. And just one more point very briefly, Your Honor. Arbitration agreements are not narrowly construed in Montana. If you're talking about a person, kind of a consumer context, that can be the case if it's a contract of adhesion. But the Topolinsky case explains that there's a policy in favor of arbitration in Montana, just as though there's a policy in favor of arbitration under the Federal Arbitration Act, although I will certainly submit that the case law in the federal arena is much broader and makes it much more clear that if you have any doubt, if the panel has any doubt about whether or not this arbitration clause applies, then the presumption of arbitrability should require the panel to decide that doubt in favor of arbitration. Tell me, how does the interchange agreement have any relationship at all to the dispute arising out of your client convincing United Harvest to build that grain elevator on its tracks? Well, first and foremost, Your Honor, again, it all goes back to per-car payments. That's what Central Montana Rail is complaining about, that the shuttle facility stole their business away. FBN stole their business away. So what's the claim about? Well, that business should have come to Central Montana Rail, they say, which means we should have gotten more per-car payments, which is required to be paid under the interchange agreement. But how is it that the magistrate, Judge Strongman, got it wrong when he said that the interchange agreement really had nothing to do with the status of the parties as business competitors? Is that something that really hadn't arisen until this grain elevator was built? Well, the interchange agreement is the contract between these two railroads. And it covers everything. I mean, admittedly, it doesn't specifically discuss their role as competitors, but it talks about the fact that the end of the day. Well, it can't cover everything. Well, certainly. But it covers per-car payments. It covers insurance. It covers trackage rights. What about competition? It doesn't discuss competition. What about negligent misrepresentation? No. It doesn't specifically cover those. And we know, Your Honor, that we're not required under an arbitration clause to say that negligent misrepresentation claims will be arbitrated. Instead, what we have to do is include some language reflecting an intent that the arbitration clause be broad. And if it is, then even collateral issues are swept within the scope of the arbitration clause. How collateral? It's got to have some relationship to the contract. Sure. What contract? Well, in this case, it's certainly the interchange agreement, Your Honor. Again, the whole case is about per-car payments, which is required under the interchange agreement with CMR. The whole case is about the railway business. And the interchange agreement's arbitration clause talks about the business. So we're to read this so broadly as to encompass everything that may deal with the railroad business. I think that was the intent, Your Honor. Okay. All right. If that's your argument. All right. I think we have both of your arguments well in hand. Thank you both for your argument here today. This matter will stand submitted.
judges: Rymer, Callahan, Wright